**VISION–EASE LENS, INC., Plaintiff,**

v.

**ESSILOR INTERNATIONAL
SA, et al., Defendants.**

**No. CIV.04–2663 RHK/AJB.**

United States District Court,
D. Minnesota.

June 10, 2004.

Jake M. Holdreith and Kimberly G. Miller, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, Minnesota, for Plaintiff.

Charles P. Baker, Nina Shreve, Donald J. Curry and Marc J. Pensabene, Fitzpatrick, Cella, Harper & Scinto, New York, New York; Karl L. Cambronne, Chestnut & Cambronne, Minneapolis, Minnesota, for Defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Preliminary relief under Federal Rule of Civil Procedure Rule 65 is a "drastic and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech. Inc.*, 995 F.2d 1566, 1568 (Fed. Cir.1993). Plaintiff Vision–Ease Lens, Inc. ("Vision–Ease") seeks a preliminary injunction against Defendants Essilor International SA and Essilor of America, Inc. (collectively, "Essilor") to prevent the introduction of a competing eyeglass lens. Vision–Ease alleges that Essilor's lens is the result of a breach of a confidential nondisclosure agreement and infringes its patent. Because Vision–Ease has fallen well short of the showing required to secure this "extraordinary remedy," *id.*, the Court will deny its motion.[1]

---

1. With the consent of the parties, this Memo-    randum Opinion and Order replaces the

## Background

Vision–Ease is an eyeglass lens manufacturer based in Minnesota. Among its products are polarizing polycarbonate prescription lenses, which it manufactures at its Ramsey, Minnesota facility. Vision–Ease owns United States Patent 6,328,446 ("the '446 patent"). The '446 patent recites a method for making a prescription lens from polarizing material and a synthetic prescription lens in an injection mold.[2] Vision–Ease sold progressive polarizing lenses during 2003. It also received royalty payments from licenses relating to its polarized lenses. Despite these sales and licenses, Vision–Ease is currently in severe financial distress, and is accepting bids for its assets.

Essilor, based in France with a wholly owned American subsidiary, is an international lens company with approximately $2 billion in annual sales. In late 2002, an Essilor representative approached Vision–Ease about supplying Essilor with sunglass lenses containing melanin, a radiation-blocking substance. In March 2003, Vision–Ease and Essilor began exploring a relationship in which Vision–Ease would supply semi-finished, single-vision, polarized, polycarbonate, melanin lenses to Essilor. Under this arrangement, Essilor would finish the lenses and sell them under the Essilor brand.

On March 18, 2003, Vision–Ease and Essilor executed a confidentiality agreement to govern the exchange of confidential information between the parties. The agreement defines confidential information as:

(a) any information disclosed by the disclosing party to recipient, whether in written form or orally, not generally known to the public and that is marked confidential or proprietary, including but not limited to ... information concerning technology ...

(b) any information disclosed in any manner after the date of this Agreement, including but not limited to disclosure by written, oral or visual means, if such information is confirmed in a writing marked confidential or proprietary supplied to the receiving party within thirty (30) days after initial oral disclosure; and

(c) any samples, tangible products or materials provided by either party hereunder that are marked confidential or proprietary.

(Hepper Aff. Ex. D ¶ 2(a)-(c).) Under the agreement, the recipient of confidential information shall "use [that] Confidential Information only for the purpose" of "evaluating a potential business relationship."[3] (*Id.* ¶¶ 3, 1.)

After Essilor started selling the Vision–Ease lens in May 2003, the parties began discussing another project in which Vision–Ease would supply Essilor with semi-finished lenses made to Essilor's design. During a June 17, 2003 meeting, Vision–Ease representatives drew a manufacturing schematic on a wipe-board. While Essilor had a long established practice concerning the disposition of the molding face used to form a semi-finished progressive lens (Meunier Decl. ¶ 15), Vision–Ease representatives explained that they prefer a different disposition of the molding face. (Second Harris Decl. ¶ 3.) A week after this meeting, Vision–Ease sent Essilor a manufacturing schematic marked as confidential.

---

Memorandum Opinion and Order filed on June 7, 2004.

**2.** Vision–Ease asserts claims 4, 24, and 27 of the '446 patent. These claims recite an injection-molded polymeric prescription lens with a polarized laminate.

**3.** On June 12, 2003, the parties executed a second, substantially similar agreement.

After preliminary discussions, Essilor elected not pursue the second lens with Vision–Ease, due to the high cost of molds and uncertainty generated by Vision–Ease's finances. Instead, Essilor elected to use an injection-molding process developed by an Essilor affiliate. In November 2003, Essilor salesmen advised retail chains that Essilor would begin to offer a polarized polycarbonate lens known as the "Ovation." Essilor made the first shipments of the Ovation lens on March 22, 2004.

During this period, Vision–Ease's financial problems became acute. It began preparing to auction its assets. In April 2004, Vision–Ease discovered that Essilor was introducing a polarized polycarbonate lens. On May 11, 2004 Vision–Ease informed the bidders for its corporate assets that Essilor planned to enter the market with a polarized lens. On the same day, Vision–Ease filed for injunctive relief with this Court. Final bids were due on May 12, 2004.

### Standard of Decision

■ Under the law of both the Eighth and Federal Circuits, the Court must weigh four factors to resolve a motion for preliminary relief: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in the movant's favor; and (4) the adverse impact on the public interest. *See Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981); *accord Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988). When applying these factors, the Court should "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182

F.3d 598, 601 (8th Cir.1999) (internal quotation marks and citations omitted). The party requesting preliminary injunctive relief bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987); *accord H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 388 (Fed.Cir.1987).

### Analysis

### I. Likelihood of Success on the Merits

Vision–Ease has moved for a preliminary injunction on its claims for breach of the confidentiality agreement and patent infringement. While the likelihood of success with regard to the first cause of action can be resolved under Eighth Circuit case law, the latter requires recourse to the law of the Federal Circuit. The Court turns first to the breach of confidentiality claim.

### A. Breach of Confidentiality Agreement

■ To prove breach of the confidentiality agreement, Vision–Ease must demonstrate that Essilor either "used or divulged confidential information and that it was the type of information covered by the Confidentiality Agreement." *Sip–Top, Inc., v. Ekco Group, Inc.*, 86 F.3d 827, 831 (8th Cir.1996). Under the terms of the agreement, confidential information includes "any information disclosed by the disclosing party to the recipient, whether in written form or orally." (*See* Hepper Aff. Ex. D ¶ 2(a).) Information is only subject to the agreement where it is "not generally known to the public" and explicitly marked as confidential. (*Id.*)

Vision–Ease's claimed trade secret involves making polarized prescription lenses using a certain disposition of the molding face.[4] Vision–Ease asserts that Essilor learned of its alleged trade secret during a meeting at which Vision–Ease

---

4. In its initial brief, Vision–Ease pointed to several other trade secrets that it claims were

utilized by Essilor. Vision–Ease did not, however, provide specific, cognizable evi-

representatives drew a manufacturing schematic on a wipe-board. As Derek Harris, Vision–Ease's Vice–President for Research and Development averred, in the meeting of June 17, 2003, Vision–Ease explained that it preferred a molding face disposition different from that typically used by Essilor. (Second Harris Decl. ¶ 3.) After measuring Essilor's Ovation lenses, Harris concluded that they were made using a mold face disposition different from Essilor's common practice. Harris found that this was in keeping with Vision's Ease's suggestion concerning the molding face disposition. (*Id.* ¶ 4.)

This claim is defective in two ways. First, Vision–Ease has not demonstrated that its suggestion regarding molding face disposition constitutes confidential information. The agreement, by its terms, requires that confidential information be "not generally known to the public" and explicitly marked as confidential. On the scant record before it, the Court has no basis for determining whether Vision–Ease's disposition of the molding face is public knowledge or not. Likewise, the record does not suggest that the communi-

cations regarding molding face disposition were labeled as confidential. (*See* Blain Decl. ¶ 15.) While Vision–Ease did later email a confidential drawing to Essilor, that drawing does not discernibly pertain to molding face disposition. (*Compare* Harris Aff. Ex. A, *with* Meissner Aff. Ex. A.) Vision–Ease has therefore not shown that the asserted information was covered by the confidentiality agreement.[5]

Second, Vision–Ease has not demonstrated the *use* of that information. Vision–Ease's argument is based on a supposition. Because, it asserts, the mold face disposition of the Ovation lenses differs from Essilor's common practice (Second Harris Decl. ¶ 4), Essilor must have used the information disclosed to it by Vision–Ease. It is not enough, however, to "point to broad areas of technology and assert that something there must have been secret and misappropriated." *Composite Marine Propellers, Inc., v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir.1992). Vision–Ease must instead show actual use. Here, the measurements that provide the basis for this hypothesis are hotly contested, and, for purposes of this motion, persuasively rebutted.[6] (*See* Pageault Decl.;

---

dence regarding these secrets. The Court will therefore not consider them for purposes of this motion.

**5.** With regard to burdens of proof, the confidentiality agreement is not a model of clarity. While it purports to shift the burden of proof to the recipient on certain exceptions to the confidentiality agreement, it simultaneously makes some of the same elements part of the discloser's prima facie case. For instance, in order to qualify as confidential information, the information must be "not generally known to the public"—placing the burden squarely on the discloser's shoulders. (*See* Hepper Aff. Ex. D ¶ 2(a).) Confidential information that is "already public knowledge," however, is subject to an exception that must be proven by the recipient. It is, of course, highly unlikely that the same information could be "not generally known to the public," and thus confidential, but also "already pub-

lic knowledge," and therefore eligible for the exception. Nonetheless, the Court's analysis applies to problems with Vision–Ease's prima facie case, and not to the exceptions. Even were the exceptions applicable, it would be Vision–Ease's burden at this stage of the litigation to prove that Essilor's defenses do not apply. *See Dr. Seuss Enters. v. Penguin Books USA*, 924 F.Supp. 1559, 1562 (S.D.Cal.1996) ("The plaintiff's burden of showing a likelihood of success on the merits includes the burden of showing a likelihood that it would prevail against any affirmative defenses raised by the defendant."), *aff'd*, 109 F.3d 1394 (9th Cir.1997); *see also Gelco Corp.*, 811 F.2d at 418 (the party requesting preliminary injunctive relief bears the "complete burden" of proving factors).

**6.** For instance, Derek Harris avers that there was a difference between the Essilor polar-

Second Blain Decl.) Even were Essilor to have altered its practice regarding the disposition of the molding face, the record does not suggest that it did so based on any information provided by Vision–Ease. Rather, the Essilor subsidiary that developed the process appears to have been unaware of that information. (*See* Blain Decl. ¶ 21; Meunier Decl. ¶ 14.)

Because Vision–Ease has shown neither the confidentiality nor use of the asserted trade secret, the Court concludes that it is unlikely to prevail on its claim under the confidentiality agreement.

### B. Patent Infringement

■■■■ Vision–Ease also seeks a preliminary injunction with regard to its claim that Essilor's lens infringes claims 4, 24, and 27 of the '446 patent. To secure injunctive relief, a patent holder must establish a likelihood of success on the merits both with respect to (1) the infringement of its patent, and (2) the validity of its patent. *Reebok International, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555–56 (Fed. Cir.1994). The patentee must demonstrate both infringement and validity by a "clear showing." *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed. Cir.1985). When the presumptions and burdens applicable at trial are taken into account, the district court "should not issue [the injunction] if the party opposing the injunction raises 'a substantial question concerning infringement or validity, meaning that it asserts a defense that [the party seeking the injunction] cannot prove lacks substantial merit.' " *Oakley, Inc. v. Sunglass Hut International*, 316 F.3d 1331, 1340 (Fed.Cir.2003) (quoting *Tate Access*

*Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365 (Fed.Cir. 2002)).

■■■■ Essilor argues that the claims asserted against it are invalid because they are anticipated by prior art. *See* 35 U.S.C. § 102. A claim is anticipated and, therefore, invalid if a reference in the prior art discloses every feature of the claimed invention, either explicitly or inherently. *Hazani v. United States Int'l Trade Comm'n*, 126 F.3d 1473, 1477 (Fed.Cir. 1997). A patent cannot issue on an invention under § 102 if "the invention was known or used by others in this country, or . . . described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). Whether a prior art reference anticipates a claim is a question of fact. *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1346 (Fed.Cir.1999).

In support of its contention that the asserted claims are not anticipated, Vision–Ease has submitted affidavits by Thomas Moravec, one of the patent's inventors. Moravec has worked in the field of ophthalmic optical lenses for eight years, and in the field of optical lenses for twenty-six years. He argues that the most plausible candidate for anticipation— Japanese patent application S56–13139 ("the Japanese '139 publication")—does not anticipate the '446 patent because it teaches "lenses" rather than lenses with a prescription power. (Moravec Aff. Ex. E. at 11–12.) He bases his conclusion on several premises:

ized Ovation lens and the Essilor clear Ovation lens which suggested a different molding face disposition. (Second Harris Aff. ¶¶ 2, 4.) However, Bruno Pageault, an engineer with Essilor International, has submitted his own declaration demonstrating that there is, in

fact, no difference in molding face disposition at all between the clear and polarized lenses. Harris appears to have erred in the assumption underlying his analysis (*see* Second Blain Decl. ¶ 4).

- The publication uses the word "lenses" generically, rather than including the words "prescription" and "power."

- The relative thickness of the various layers, as revealed in illustrations, indicate that the lens could not support a prescription power.

- The publication teaches that the polarizing layer could be fused to either the convex or concave sides of the lens. Since the concave side is typically ground in prescription lenses, such grinding would destroy the polarized layer.

- The publication does not disclose the molding parameters required to make a prescription lens.

*Id.*

In response, Essilor has submitted the Declaration of Russell Weymouth, a mechanical engineer with twenty-three years of experience in the injection molding of polycarbonate products, including ophthalmic lenses of all kinds. Weymouth argues that all the limitations in the asserted claims are, in fact, taught by the Japanese '139 publication. (Weymouth Decl. ¶ 22, Ex. H.) He also rejects each of Moravec's premises:

- The Japanese '139 publication is silent as to whether lenses do or do not have a prescription power. He contends that a person with ordinary skill in the art would read the word "lenses" as embodying both prescription and non-prescription lenses. (*Id.* ¶ 30.)

- A person of ordinary skill in the art would know that the illustrations from which Moravec gleaned the relative thickness of various layers were not drawn to scale.

- Lenses can be, and often are, ground on either the convex or concave side.

- The same considerations are relevant in determining molding parameters whether or not the lens has a prescription power.

(*Id.*)

Comparing these submissions, Vision–Ease has not demonstrated a "lack[ ] substantial merit" in Essilor's anticipation defense. *Tate Access Floors,* 279 F.3d at 1365. While Vision–Ease attempts to distinguish its claims from that of the prior art, the Court is persuaded by Essilor's argument that the Japanese '139 publication includes both prescription and non-prescription lenses. Indeed, a patent examiner recently found that "[c]learly, one of ordinary skill in this art would recognize that the general processing taught in Japanese–139 would be used to make a prescription lens." Office Action, Application No. 10/83,088, U.S. Patent and Trademark Office (April 9, 2003); *see also* Fed.R.Evid. 201(b). By persuasively rebutting each and every premise underlying Moravec's declarations, Essilor has raised 'a substantial question concerning ... validity.' " *Oakley, Inc.,* 316 F.3d at 1340. Vision–Ease has therefore failed to demonstrate a likelihood of success on the merits of its patent claim.[7]

## II. Irreparable Harm & the Balance of Harms

▮▮▮▮▮▮ " 'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' Thus, to warrant ... preliminary [injunctive relief], the moving party must demonstrate a sufficient threat of irreparable harm." *Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th

---

**7.** Having found that Vision–Ease is unlikely to succeed on anticipation, the Court need not reach the questions of obviousness and infringement. *See Sofamor Danek Group, Inc.* v. *DePuy–Motech, Inc.,* 1994 WL 846541, at *10 (S.D.Ind.1994), *aff'd,* 74 F.3d 1216 (Fed. Cir.1996).

Cir.1999) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). In a patent case, the patentee must show "objective proof" of a "specific injury" that may occur in the absence of an injunction. *High Tech. Med. Instrumentation v. New Image Indus.*, 49 F.3d 1551, 1556–57 (Fed.Cir. 1995). In both the Eighth and Federal Circuits, failure to show irreparable harm, by itself, provides sufficient reason to deny a preliminary injunction. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003); *accord Reebok*, 32 F.3d at 1556.[8]

Vision–Ease asserts that it will suffer "immediate and irreparable harm unless Essilor is restrained from entering the market." (Pl.'s Reply Mem. at 5.) Douglas Hepper, the president of Vision–Ease, avers "the impact to the bottom line of Vision–Ease this year of a competing product from Essilor could be a loss of approximately $1 million to $4 million in profit in the next 1–2 quarters." (Hepper Aff. ¶ 19.) Given Vision–Ease's unrelated dire financial straits, "[a] loss of $1 million in profit puts at least 20 jobs at risk. A loss of $4 million means most likely closing the Ramsey [County]-based manufacturing altogether—terminating over 200 employees." (*Id.* ¶ 20.) In rebuttal, Essilor advances the Declaration of Michael Daley, the president of the Essilor Lens Group. Daley avers that "[p]olarized sunware is a growing field." (Daley Decl. ¶ 12.) Because only three to five percent of all

lenses sold in the United States are polarized, there is substantial room for the market to grow. Accordingly, "Essilor's efforts to promote the value of polarized sunware will increase the size of the market for all manufacturers." (*Id.*)

Vision–Ease's threatened economic injury, by itself, "does not support a finding of irreparable harm, because such injury can be remedied by a damage award." *Rent–A–Center v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.1991). A finding of irreparable harm, in this instance, therefore hinges on the purported loss of jobs. Hepper's affidavit, however, is too thinly supported to justify such a finding. Not only are his averments conclusory, but they are larded with qualifiers: There *could* be a loss of one to four million dollars, which, on the low end, would put jobs *at risk*, and, on the high end, would *most likely* mean closing the manufacturing plant. Hepper has provided no basis for these conclusions. While there *could* be a loss of one to four million dollars, there also, presumably, could not be. While jobs might be affected *if* losses were to fall within this speculative range, they also might not be. Any economic injury has the potential to affect jobs. To secure preliminary relief, a plaintiff must do more than raise, *ipse dixit*, that possibility; he must concretely demonstrate it. Because Vision–Ease has fallen short of that standard here, it has not demonstrated irreparable harm.[9]

8. Neither the presumption of irreparable harm in the confidentiality agreement nor the presumption generated by a likely-infringed patent is available to Vision–Ease here. Because it has not demonstrated coverage under the confidentiality agreement, there is nothing to trigger the contractual presumption. Likewise, because Vision–Ease has not shown a likelihood of success on its patent claim, it cannot avail itself of the presumptions available to a patentee with a likely-infringed patent.

9. Vision–Ease's credibility as a market assessor is further damaged by missing the launch of the Ovation lens. While this motion is predicated on the "major market impact" of that lens' introduction, the Ovation is already on the market. Throughout its initial papers, Vision–Ease sought to forestall a May 15, 2004 launch date for the Ovation lens. Yet, as the Declaration of Michael Daley makes clear, Essilor began shipping the Ovation lens on March 22, 2004. (Daley Decl. ¶ 9.) While Essilor planned to release another lens—the "Panamic"—in late May, Vision–Ease has not

## III. The Balance of Harms and the Public Interest

Because Vision–Ease has demonstrated neither a likelihood of success on the merits nor irreparable harm, the Court will only briefly address the final two factors relating to the balance of harms and the public interest. As with the other factors, these tip against injunctive relief. While the financial conditions of the parties differ, the harm to Vision–Ease of enduring ordinary market forces does not match the harm to Essilor of withholding a legitimate product. *See Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir.1990) ("The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating."). The public interest likewise weighs in favor of legitimate competition. *See 3M Innovative Properties Co. v. Avery Dennison Corp.*, 185 F.Supp.2d 1031 (D.Minn.2002), *rev'd on other grounds*, 350 F.3d 1365 (Fed.Cir. 2003). Accordingly, because Vision–Ease has carried none of the relevant factors, preliminary relief is inappropriate.

### Conclusion

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS ORDERED** that Plaintiff's Motion for a Preliminary Injunction (Doc. No. 3) is **DENIED.**[10]

provided any evidence regarding that lens. Because the Ovation lens is already on the market, and because Vision–Ease has apparently not noticed it, the Court must further discount Vision–Ease's dire pronouncements regarding the effect of the competing lens.

10. In accordance with Fed.R.Civ.P. 52(a), the foregoing Memorandum Opinion and Order are the Court's findings of fact and conclusions of law that constitute the grounds of its action.